# IN THE COURT OF APPEALS OF IOWA

No. 13-2087
Filed February 11, 2015

**IN RE THE MARRIAGE OF MICHELLE NICHOLE GARLAND STERN
AND MENACHEM MEDEL STERN**

**Upon the Petition of
MICHELLE NICHOLE GARLAND STERN,**
        Petitioner-Appellee,

**And Concerning
MENACHEM MEDEL STERN,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Story County, Timothy J. Finn,

Judge.


        A father appeals from the visitation provisions of the decree of dissolution.

**AFFIRMED AS MODIFIED AND REMANDED.**


        Ryan G. Koopmans and Keith P. Duffy of Nyemaster Goode, P.C., Des

Moines, for appellant.

        Nicole S. Facio of Newbrough Law Firm, L.L.P., Ames, for appellee.


        Heard by Vaitheswaran, P.J., and Doyle and McDonald, JJ.

**MCDONALD, J.**

A father appeals the visitation provisions of the decree dissolving his marriage. Specifically, the father challenges a geographical restriction in the decree that limits the father's summer visitation with his son to visitation within the United States until the child is sixteen years old. The father contends he should be able to exercise summer visitation with his son in Israel prior to the child turning sixteen. The father also challenges the duration of the winter-break visitation awarded him. He contends he should have two weeks' winter visitation rather than a single week.

I.

The father, Menachem Medel Stern, is a dual Israeli-Canadian citizen, and the mother, Michelle Nichole Garland, is a dual Israeli-American citizen. The child, D.J.G.S., is a dual Israeli-American citizen. The parties met in 2000 when Michelle visited Israel, where Menachem lived and worked. In 2001, Michelle moved to Israel, with her two children from a previous marriage, to live with Menachem. The parties married in a religious ceremony according to the Jewish faith. Their child, D.J.G.S., was born in 2003. In 2005, Michelle was accepted into a Ph.D. program at Iowa State University. Menachem executed a written authorization for D.J.G.S. "to leave Israel and live with Michelle in the United States for as long as she is enrolled in her Ph.D. studies at Iowa State University." Michelle moved with the children to Ames. Later in 2005, Menachem joined Michelle. The parties married in a civil ceremony in June 2006.

In October 2007, Michelle commenced an action to dissolve the parties' marriage. Menachem returned to Israel in February 2008. After a protracted series of court proceedings, including Menachem filing a child abduction action under the Hague Convention in federal court, the Iowa district court entered a decree of dissolution of marriage in June 2011. The decree dissolved the parties' marriage but ordered that child custody, physical care, visitation, and support be tried in future proceedings after the conclusion of the parties' case arising under the Hague Convention.

In July 2013, following trial, the district court resolved the outstanding issues regarding child custody, physical care, visitation, and support. The court ordered joint legal custody with Michelle having physical care. The court divided the visitation schedule into two periods: first, when Menachem "can visit the child in the United States," and later, "when the court will allow Menachem to take the child with him to Israel." The court determined all visitation must be held in the United States "until the child is sixteen years of age." "After age sixteen, Menachem may file an application for specific visitation rights outside of the United States." Specifically, the court ordered Menachem

> shall be entitled to take the child out of the United States, provided that prior to that time he either reaches a written agreement with Michelle or has applied [for] and obtained a court order concerning the application to take the child outside of the United States. The issue of whether Menachem should be required to post a bond will be addressed at that time.

The court found reasonable visitation for Menachem included one-half of the winter break from school and six weeks during the summer. Menachem filed this appeal.

II.

We review dissolution decrees de novo. *See In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009). "Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses." *In re Marriage of Witten*, 672 N.W.2d 768, 773 (Iowa 2003).

III.

A.

Menachem requests D.J.G.S. "be allowed to visit his father and his siblings in Israel" prior to the time D.J.G.S. is sixteen years of age. Iowa courts have "long recognized the need for a child of divorce to maintain meaningful relations with both parents." *In re Marriage of Leyda*, 355 N.W.2d 862, 866 (Iowa 1984). Iowa Code section 598.41(1) (2013), provides the court shall order custody and "liberal visitation rights where appropriate" to "assure the child the opportunity for the maximum continuing physical and emotional contact with both parents." Section 598.1(1) defines "best interest of the child" to include "the opportunity for maximum continuous physical and emotional contact possible with both parents." The Code does not in any way limit these considerations solely because one of the parents resides outside the borders of Iowa or the United States.

Our case law also does not recognize any limitation on visitation rights solely because one of the parents resides outside the borders of Iowa or the United States. "The world does not end at the borders of Iowa." *In re Marriage*

*of Hatzievgenakis*, 434 N.W.2d 914, 917 (Iowa Ct. App. 1998). "Our hope for justice for our citizens in foreign courts can best be forwarded by our efforts to offer fair and equitable treatment to foreign nationals in our jurisdiction." *Id.* D.J.G.S. is a citizen of two countries—he was born in Israel to Israeli citizens, lived there during the first two years of his life, has many extended family members there, including a half-brother and half-sister—and has a right to build a meaningful relationship with his father and fully experience his dual heritage. *See id.* (finding child should be allowed to visit father in Greece as the child "is a citizen of two countries and has a right to be introduced and exposed to both").

Michelle argues the restriction on international visitation is proper because Menachem is not likely to return D.J.G.S. to the United States following visitation. Michelle notes Menachem stated, in 2005, that he briefly considered leaving the country with D.J.G.S. During trial, Menachem admitted he briefly considered leaving the country with D.J.G.S. in 2005. He also testified he has not considered it since that time. We find his testimony credible. In contrast, the district court found Michelle's testimony regarding her concerns with Menachem to be not credible. The court made several pointed credibility findings regarding Michelle, finding much of her testimony "fanciful," "exaggerated," and "simply not true." We give great weight to the district court's credibility determination.

Michelle also notes the court has previously found Menachem in contempt for not complying with a visitation order. We conclude that isolated incident is of little probative value. As the district court noted, "some of this behavior was aggravated by Michelle's attitude and inflexibility on visitation." For instance,

"after the visitation schedule was adopted, Michelle moved from Ames to Postville, but she was not willing to be flexible on the midweek visitation times even though she and D.J.G.S. now lived 175 miles farther away than when the schedule was set up."

Michelle also argues the restriction on international visitation is proper because it would be incredibly difficult and expensive to have D.J.G.S. returned to the United States if Menachem did not voluntarily return D.J.G.S. Israel is a signatory of the Hague Convention on the Civil Aspects of International Child Abduction.[1] The Hague Convention on the Civil Aspects of International Child Abduction is "an international treaty the purpose of which is to discourage international parental child abduction and to ensure children who are abducted or wrongfully retained in a party's country are returned to their country of habitual residence." *In re Marriage of Rudinger*, No. 09-0281, 2009 WL 3337609, at *3 (Iowa Ct. App. Oct. 7, 2009). The United States State Department publishes a report regarding signatory country compliance with the Hague Convention. Areas of concern for the State Department are: (1) countries not compliant with the Convention; (2) countries with a pattern of non-compliance with the Convention; and (3) countries with enforcement concerns. During the last three years, Israel has not been identified as non-compliant in any of these respects. *See* http://travel.state.gov/content/dam/childabduction/complianceReports.

Although not an explicit rule or standard, "[g]enerally, courts have approved out-of-country visitation when the country is a signatory to the Hague

---

[1] *See* http://travel.state.gov/content/childabduction/english/country/hague-party-countries.html

Convention and there is insufficient proof of an intention to wrongfully retain the child." *Abouzahr v. Matera-Abouzahr*, 824 A.2d 268, 281 (N.J. Super. Ct. App. Div. 2003); *see, e.g.*, *id.* at 282 (allowing father out-of-country visitation with his daughter in Lebanon, despite it being a non-signatory country, and noting father "has made no effort to sneak [his daughter] out of this country [when he has had previous visitation], although he had opportunities to do so"); *In re Rix*, 20 A.3d 326, 329 (N.H. 2011) ("[W]e conclude that while a foreign country's Hague Convention signatory status should be a significant factor for the trial court to consider, it cannot, standing alone, be determinative of whether it is in the best interests of a child to travel with a parent outside the country."); *Katare v. Katare*, 283 P.3d 546, 552-53 (Wash. 2012) (en banc) (denying father's request to take children to India, a non-signatory nation, where father's "pattern of abusive, controlling, punishing behavior put the children at risk of being used as tools to continue this conduct," thus convincing the court of an increased risk of abduction especially in light of the father's threats to take the children to India without permission).

Considering the best interest of the child, the lack of evidence establishing that Menachem intends not to return D.J.G.S. to the United States following visitation, the fact that Israel is a signatory to the Hague Convention, and the factors set forth in *Abouzahr*, we conclude the district court should not have prohibited visitation in Israel until D.J.G.S. is sixteen years old. *See Hatzievgenakis,* 434 N.W.2d at 917 (vacating restrictions on out-of-county visitation where there was no evidence of intent not to return other than mother's

generalized fears); *see also Keita v. Keita*, 823 N.W.2d 726, 732 (N.D. 2012) (finding father who lived in Mali, West Africa, was not a flight risk with the child because "[t]he record does not include specific evidence that [father] has an intent to abscond or flee with the child or that he hindered [mother's] custody of the child"). Accordingly, we reverse those provisions of the court's order that restrict visitation to within the United States and that require Menachem either to reach a written agreement with Michelle or to apply for and obtain a court order concerning the application to take the child outside of the United States.

The district court deferred the question of posting a bond until visitation in Israel was possible. Because we have vacated the geographic restriction on visitation prior to D.J.G.S. turning age sixteen, the issue whether Menachem should post a bond and in what amount is ripe for determination. Michelle requests a bond of $30,000 because she would not have the financial resources to fight abduction of D.J.G.S. by Menachem, while Menachem requests no bond based on the district court's determination he earns only $14,950 per year, of which $6900 goes to child support. We remand this issue to the district court for determination.

Menachem requests that Michelle split the costs of having D.J.G.S. travel to Israel, either through direct payment by Michelle or through a reduction in Menachem's child-support payments, while Michelle asserts she lacks the resources to pay half the costs of transportation as she only makes $16,347 per year, plus child support. Because of the district court's restrictions on visitation until D.J.G.S. reached age sixteen, it did not address this issue. Based on our

removal of the geographic restrictions on summer visitation, we remand this issue to the district court for determination.

B.

Menachem next contends the court should have allowed him visitation for the two weeks of D.J.G.S.'s winter break from school. Menachem argues travel from Israel to Iowa is very expensive, and one week of visitation is not long enough for someone who has not been able to see their child for six months. Michelle agreed Menachem should be allowed visitation for the two weeks of winter break, so long as D.J.G.S. does not miss any school. We see no reason not to adopt the agreement of the parties. We modify the court's order to provide that Menachem shall have visitation with D.J.G.S. during the winter school break, but he must return D.J.G.S. when school resumes. If the winter break is longer than two weeks, Menachem's visitation shall be for the final two weeks of the school break.

C.

Michelle requests appellate attorney fees in the amount of $3000. "An award of appellate attorney fees is within the discretion of the appellate court." *Spiker v. Spiker*, 708 N.W.2d 347, 360 (Iowa 2006). "Whether such an award is warranted is determined by considering 'the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal.'" *Id.* (citation omitted). Michelle claims this protracted litigation has cost her well over $35,000 in total attorney fees and she therefore deserves $3000 in appellate attorney

fees.  Based on the parties' nearly equal financial positions and our resolution of the issues, we determine no award of appellate attorney fees is appropriate. Costs of this appeal shall be taxed equally to both parties.

**AFFIRMED AS MODIFIED AND REMANDED.**